# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40333**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Jakalien J. COOK**
Airman (E-2), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 3 July 2024

———————————

*Military Judge*: Christopher D. James (Article 30a); Colin P. Eichenberger.

*Sentence*: Sentence adjudged 18 February 2022 by GCM convened at Davis-Monthan Air Force Base, Arizona. Sentence entered by military judge on 20 April 2022: Dishonorable discharge, confinement for 27 months, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant*: Major Matthew L. Blyth, USAF; Major Heather M. Bruha, USAF.

*For Appellee*: Colonel Zachary T. Eytalis, USAF; Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel James P. Ferrell, USAF; Major Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, DOUGLAS, and WARREN *Appellate Military Judges*.

Judge WARREN delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge DOUGLAS joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4**

———————————

WARREN, Judge:

Appellant faced eight specifications at a general court-martial and entered mixed pleas to these offenses. Appellant pleaded guilty to one specification of absence without leave (AWOL), in violation of Article 86, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 886; one specification of breach of restriction, in violation of Article 87b, UCMJ, 10 U.S.C. § 887b; and one specification of wrongful use of a controlled substance (marijuana) on divers occasions, in violation of Article 112a, UCMJ, 10 U.S.C. § 912a.[1] The military judge found these pleas provident and entered findings of guilty.

As to the remaining specifications, a general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of illegally transporting aliens[2] within the United States, in violation of clause 3 of Article 134, UCMJ, 10 U.S.C. § 934 (incorporating the non-capital offense of 8 U.S.C. § 1324); one specification of conspiring to illegally transport aliens within the United States, in violation of Article 81, UCMJ, 10 U.S.C. § 881;[3] and one specification of obstructing justice, in violation of Article 131b, UCMJ, 10 U.S.C. § 931b.[4] The military judge sentenced Appellant to a dishonorable discharge, confinement for 27 months, forfeiture of all pay and allowances, and reduction in rank to the grade of E-1. The convening authority took no action on the findings and approved the sentence in its entirety.

Appellant asserts 14 issues on appeal, summarized as follows: (1) whether Appellant's conviction for transporting aliens unlawfully in the United States is factually insufficient; (2) whether Appellant's conspiracy specification fails to state an offense because it does not allege conspiracy to commit an offense under the UCMJ; (3) whether Appellant's conviction for conspiracy to transport aliens in the United States is factually insufficient; (4) whether the military judge abused his discretion in denying a defense motion to dismiss based on the Government's deportation of witnesses to the alleged offenses before trial; (5) whether omission of the Government's closing argument slides—

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ, Military Rules of Evidence (Mil. R. Evid.), and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] "Aliens" is a term utilized in 8 U.S.C. § 1324. *See* 8 U.S.C. § 1101 (a)(3) ("The term "alien" means any person not a citizen or national of the United States.").

[3] The specifications of illegally transporting aliens and conspiring to illegally transporting aliens incorporate the non-capital offense of 8 U.S.C. § 1324.

[4] After the Government rested its case-in-chief, the military judge raised and granted *sua sponte* an R.C.M. 917 motion for findings of not guilty on the two remaining specifications under Article 134, UCMJ, incorporating the non-capital offense of 18 U.S.C. § 922(g) for illegal possession of a firearm and ammunition by a drug abuser.

with embedded videos in evidence and played to the members—necessitates remand for correction; (6) whether the military judge abused his discretion when he allowed the Government to introduce the criminal history of one of the aliens as aggravation evidence at sentencing; (7) whether the military judge and parties incorrectly calculated the maximum punishment (as to the transporting and conspiracy to transport aliens offenses), thereby impermissibly "tripling" Appellant's total punitive exposure; (8) whether Appellant's sentence is inappropriately severe; (9) whether Appellant's sentence to confinement for the specifications of Charge I and Charge II (AWOL and breaking restriction) exceeded the maximum punishment for each offense; (10) whether relief is required because the convening authority failed to provide reasoning for denying Appellant's requests for deferment of reduction in rank and forfeitures; (11) whether Appellant is entitled to *Moreno*, or alternatively, *Tardif* relief because of the 200-day delay between announcement of the sentence and docketing with this court;[5] (12) whether Appellant was denied a constitutional right to a unanimous verdict; (13) whether Appellant's conviction for obstruction of justice is factually and legally sufficient; and (14) whether Appellant's convictions for transporting aliens and conspiracy to transport aliens are legally sufficient.[6] Finally, we identified one additional issue requiring analysis: (15) whether Appellant is entitled to *Moreno* relief because more than 18 months elapsed from the docketing of Appellant's case to the issuance of our decision.

We have carefully considered issues (10), (12), and (13) and find Appellant is not entitled to relief. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)). We find Appellant is entitled to relief for issue (9) and order appropriate action in our decretal paragraph. As to Appellant's remaining issues and our additional issue, we find no error that materially prejudices a substantial right of Appellant and affirm the findings and the sentence.

# I. BACKGROUND

Appellant was apprehended by law enforcement for suspected illegal transportation of five Mexican nationals near the Arizona-Mexico border on 22 August 2021. At that time, Appellant, who was stationed at Davis-Monthan Air Force Base (AFB), Arizona, was pending administrative separation from the

---

[5] "*Moreno*" and "*Tardif*" refer to *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006) and *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002).

[6] Appellant personally raises issues (13) and (14) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

Air Force after only two years of his six-year enlistment owing to his prior wrongful marijuana use.[7]

Appellant's involvement in transporting and conspiring to transport five Mexican nationals came about after his close friend, QM, a former Airman discharged in June 2021, replied to a Snapchat message from an unknown person on 14 August 2021 offering "easy money" for transporting Mexican nationals upon entering the United States. While only QM received and responded to this Snapchat message, phone records presented at trial indicated QM called Appellant on Sunday, 22 August 2021, at approximately 1100. By 1230, Appellant had arranged to extend a one-day rental contract for a white Jeep Cherokee SUV, which Appellant and QM had picked up the day before at the Tucson International Airport, Arizona, located near Davis-Monthan AFB.

Thereafter, at approximately 2230 on 22 August 2021, Sergeant CM of the Arizona Department of Public Safety (DPS) apprehended Appellant and QM in Appellant's rental vehicle along with five Mexican nationals near Hereford, Arizona, less than 10 miles from the border, but over 90 miles from Appellant's duty station. The five Mexican nationals were dressed in camouflage and wearing "carpet shoes" that obscured their footprints.[8] These Mexican nationals were strangers to Appellant and QM, who had picked them up after an unknown caller from a Mexican area code contacted QM via WhatsApp at least eight times that evening.

After the group was pulled over and detained by Sergeant CM, there was an interval of approximately 30 minutes before agents from U.S. Customs and Border Protection (USCBP) responded to the scene. Appellant and QM each "factory reset" their phones sometime between the time of the vehicle stop and their respective interviews by USCBP agents. This erased all call logs, voicemail, and text messages from their phones. This act formed the basis for Appellant's conviction of obstruction of justice, in violation of Article 131b, UCMJ.

USCBP agents ultimately released Appellant and QM at approximately 0700 on 23 August 2021, after notifying Air Force officials that Appellant had been arrested and detained on suspicion of illegally transporting aliens. As a

---

[7] Appellant received nonjudicial punishment on 24 June 2021 for multiple marijuana uses between 15 April 2021 and 7 June 2021. Appellant engaged in approximately six additional marijuana uses between on or about 8 June 2021 and on or about 21 September 2021, for which Appellant was convicted, consistent with his pleas, of violation of Article 112a, UCMJ, 10 U.S.C. § 912a, at this court-martial.

[8] A border patrol agent testified at trial these are made of "carpet" material, and undocumented noncitizens often wear them over their existing shoes so as to not leave footprints.

result of his arrest and detention, Appellant was unable to report for duty as scheduled on 23 August 2021, thus forming the basis for his conviction of absence, without authority, from his place of duty, in violation of Article 86, UCMJ.

Finally, after reporting back to base on 23 August 2021 and being interviewed by investigators from the Security Forces Office of Investigations (SFOI), Appellant's commander restricted him to base on 24 August 2021. Appellant broke this restriction the same evening, resulting in the conviction for violation of Article 87b, UCMJ.

## II. DISCUSSION

### A. Failure to State an Offense—Conspiracy

Appellant argues, for the first time on appeal, that the specification in Additional Charge I alleging conspiracy to transport aliens fails to state an offense because (1) the offense as described in the charge sheet does not explicitly identify Article 134, UCMJ, as the predicate offense; and (2) even if it did, 8 U.S.C. § 1324 is not an "offense under this chapter" within the meaning of Article 81, UCMJ, even if incorporated via Article 134, UCMJ. For the reasons set forth below, we are unpersuaded.

#### 1. Additional Background

At trial, the parties agreed during discussion of the findings instructions that the predicate offense for the conspiracy charge was Article 134, UCMJ, incorporating 8 U.S.C. § 1324 under clause 3 as a "crime or offense not capital." Without objection by trial defense counsel, the military judge took judicial notice 8 U.S.C. § 1324 is a "crime or offense not capital" and provided the members with a findings instruction to this effect. Appellant did not challenge Additional Charge I and its specification at trial for failure to state an offense.

#### 2. Law

Whether a specification fails to state an offense is a question of law which this court reviews de novo. *United States v. Turner*, 79 M.J. 401, 404 (C.A.A.F. 2020) (citation omitted).

"A specification is a plain, concise, and definite statement of the essential facts constituting the offense charged. A specification is sufficient if it alleges every element of the charged offense expressly or by necessary implication; however, specifications under Article 134[, UCMJ,] must expressly allege the terminal element[,]" such being prejudicial to good order and discipline, service discrediting, or a crime or offense not capital. Rule for Courts-Martial (R.C.M.) 307(c)(3). This requirement is meant to "give the accused notice" of the charges he must defend and "protect him against double jeopardy." *United*

*States v. Dear*, 40 M.J. 196, 197 (C.M.A. 1994) (citing R.C.M. 307(c)(3) (1984)) (additional citation omitted). "[I]n order to state the elements of an inchoate offense under Articles 80 and 81, UCMJ, a specification is not required to expressly allege each element of the predicate offense." *United States v. Norwood*, 71 M.J. 204, 205, (C.A.A.F. 2012) (footnote omitted). "However, sufficient specificity is required so that an accused is aware of the nature of the underlying target or predicate offense — particularly in the context of an underlying Article 134, UCMJ, offense." *Id.* at 207.

A specification is viewed with "maximum liberality" when attacked for the first time on appeal. *Turner*, 79 M.J. at 403 (citation omitted). In other words, challenges after trial "will be viewed with greater tolerance and . . . liberally construed in favor of validity." *Id.* at 405 (alteration, internal quotation marks and footnote omitted). A reviewing court may consider the entire record of trial in deciding whether a specification as alleged necessarily implied all the essential elements. *See United States v. Hamilton*, 82 M.J. 530, 534 (A. Ct. Crim. App. 2022) ("[W]e are not only confined to the text of the specification, we next look to the record to see if the specification's wording . . . necessarily implied [the elements of the offense and] therefore gave appellant sufficient notice of the offense he must defend himself against.").

Article 81(a), UCMJ, provides: "Any person subject to this chapter who conspires with any other person to *commit an offense under this chapter*[9] shall, if one or more of the conspirators does an act to effect the object of the conspiracy, be punished as a court-martial may direct." (Emphasis added).

Article 134, UCMJ, provides, in the pertinent part:

> Though not specifically mentioned in this chapter, . . . crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-marital, according to the nature and degree of the offense, and shall be punished at the discretion of that court.

8 U.S.C. § 1324(a)(1)(A)(ii) punishes one who:

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.

"As a general rule, crimes and offenses not capital, as defined by Federal statutes, may be properly tried as offenses under clause (3) of Article 134."

---

9 Chapter 47, 10 United States Code: the UCMJ.

*United States v. Perkins*, 47 C.M.R. 259, 263 (A.F.C.M.R. 1973). "[A]n offense charged under the third clause of Article 134 is just as much 'an offense under' the [UCMJ] as is an offense alleged under the first two clauses of that Article or under any other punitive article." *United States v. Craig*, 19 M.J. 166, 169 (C.M.A. 1985) (affirming Article 80, UCMJ, attempt conviction for underlying Article 134, UCMJ, clause 3 offense); *see also United States v. Ashworth*, NMCCA 201500028, 2015 CCA LEXIS 373, at *11 (N.M. Ct. Crim. App. 3 Sep. 2015) (unpub. op.) (affirming Article 82, UCMJ, 10 U.S.C. § 882, solicitation conviction with underlying offense of distribution of child pornography proscribed in 18 U.S.C. § 2252 assimilated into Article 134, UCMJ, clause 3 offense).

Statutory interpretation is a question of law we review de novo. *United States v. Wilson*, 76 M.J. 4, 6 (C.A.A.F. 2017) (citation omitted). "Unless the text of a statute is ambiguous, 'the plain language . . . will control unless it leads to an absurd result.'" *United States v. Schell*, 72 M.J. 339, 343 (C.A.A.F. 2013) (quoting *United States v. King*, 71 M.J. 50, 52 (C.A.A.F. 2012)) (additional citation omitted). "Whether the statutory language is ambiguous is determined 'by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *United States v. McPherson,* 73 M.J. 393, 395 (C.A.A.F. 2014) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

### 3. Analysis

Appellant contends it is "questionable" whether an accused may be convicted of conspiracy to violate Article 134, UCMJ, based on an assimilated offense outside the UCMJ. We hold, however, that the language of Article 81, UCMJ, that permits criminalizing a conspiracy to commit any offense "under this chapter" includes offenses under clause 3 of Article 134, UCMJ. Both our predecessor court and our superior court have concluded the term "crimes and offenses not capital" includes all non-capital federal criminal statutes. *See Perkins*, 47 C.M.R. at 263; *see also Craig*, 19 M.J. at 169 ("This interpretation of the relationship between Articles 80 and 134 does not violate the canon of statutory construction that penal statutes should be construed strictly because it merely gives effect to the clear meaning of the language of the [UCMJ]."). Moreover, Congress recently reaffirmed its intent to give Article 134, UCMJ, broad scope and boundaries, which undermines Appellant's policy argument that such a construction provides too wide a berth of prosecutorial discretion. National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 5451, 130 Stat. 2000, 2958 (2016) (expanding the reach of clause 3 of Article 134, UCMJ, by explicitly providing extraterritorial jurisdiction for all "crimes and offenses not capital" incorporated under this clause).

Here, viewing the specification at issue with "maximum liberality" we find it alleges a UCMJ violation by implication. *See Turner*, 79 M.J. at 402. That is, even though the conspiracy specification referenced only 8 U.S.C. § 1324 and did not explicitly identify clause 3 of Article 134 as the predicate offense, the language used is sufficient to effectively plead the conspiracy specification under the facts of this case. It put Appellant on actual notice of the predicate offense. The parties below clearly understood the underlying offense of the conspiracy charge was under clause 3 of Article 134, incorporating the non-capital offense of 8 U.S.C. § 1324. The purpose of charging is to provide adequate notice of the nature of the offense to be defended at trial and to prevent double jeopardy for the charged specification after trial. *Dear*, 40 M.J. at 197. The language of this specification does both by implication, when viewed in the context of the entire charge sheet, including Specification 1 of Charge IV, which alleged a violation under clause 3 of Article 134, expressly incorporating transportation of aliens in violation of 8 U.S.C. § 1324 as the crime or offense not capital. Appellant is not persuasive in arguing that he lacked notice of the conspiratorial conduct he needed to defend against when he was also charged with a substantive offense involving the same conduct (transporting aliens), and he does not profess any confusion as to the misconduct alleged in that charge.

## B. Legal and Factual Sufficiency of Appellant's Transporting Aliens and Conspiracy to Transport Aliens

Appellant challenges the legal and factual sufficiency of his convictions for transporting aliens in the United States, in violation of Article 134, UCMJ, and conspiracy to commit the same, in violation of Article 81, UCMJ. As to Appellant's factual sufficiency challenge to those convictions, this case calls upon us to apply the new standard of review set forth by Congress in the 2021 amendments to Article 66(d), UCMJ, 10 U.S.C. § 866(d). *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (FY21 NDAA), Pub. L. 116-283, § 542(b), 134 Stat. 3611, 3661–62 (1 Jan. 2021).

### 1. Additional Background

Appellant and his civilian co-conspirator, QM, had served together in the Security Forces Squadron at Davis-Monthan AFB prior to QM's separation from active duty. QM described their relationship as "brothers."

In August 2021, QM was unemployed and desperate for money to provide for his fiancée and the first child they were expecting. On approximately 14 August 2021, QM received a Snapchat message from an unknown correspondent in response to QM posting a story about how he needed "money, money, money." This correspondent offered QM a chance to make $500.00 per person transporting undocumented aliens within the United States. QM agreed.

Appellant rented a SUV on 21 August 2021, initially for one day. QM called Appellant at approximately 1100 on Sunday, 22 August 2021, the day of the charged misconduct. Approximately one hour and twenty minutes later, Appellant and QM were at the Tucson International Airport together extending that rental for an additional day, although each owned his own vehicle. Appellant paid for and was listed as the primary driver for this rented vehicle.

Later that afternoon, Appellant and QM drove south from Tucson to Sierra Vista, Arizona, purportedly for sightseeing, and then north to Phoenix to drop off QM's fiancée. Appellant and QM then traveled back to Sierra Vista while taking turns driving during this half-day-long journey. On the way, QM's iPhone repeatedly rang showing a WhatsApp number with a foreign "53" area code visible on the Apple CarPlay display.

Appellant and QM reached Sierra Vista at approximately 2230 hours, with QM now driving the vehicle. At some point, they turned off the main highway and traveled on a dirt road near Hereford, Arizona, less than ten miles from the Mexico border. They stopped their vehicle and a man dressed in gray clothing spoke with QM briefly. Then the man in gray opened the trunk of Appellant's rental SUV and five people entered—three into the back seat and two into the rear hatch area. Appellant and QM did not know any of them. The man in gray did not enter the vehicle, but yelled, "Dale, dale, dale," meaning "go on" in Spanish.

As they drove away, Appellant noticed their five passengers apparently ducking as Appellant's rental vehicle passed a marked Arizona DPS squad car, with Appellant purportedly exclaiming: "[W]hy the f[**]k is they ducking?!" QM continued to drive the rental vehicle about two miles before Sergeant CM apprehended Appellant, QM, and the five passengers. Sergeant CM found Appellant in the passenger seat and a Glock-45 pistol registered to Appellant stored in the console with a 33-round magazine with 15 rounds of ammunition loaded. Sergeant CM observed the five other passengers dressed in camouflage, wearing "carpet shoes," with a strong "dirty, sweaty, musty" odor, and feigning sleep. None of them spoke English.

Sergeant CM contacted USCBP for assistance for suspected alien smuggling. Sergeant CM observed Appellant and QM with their mobile phones as he called for assistance. Homeland Security agents later arrived and questioned QM and Appellant in the early morning hours of 23 August 2021. By then, their phones had been "factory reset," wiping away their call logs, text messages, and voice mail.

QM initially insisted to Homeland Security that he was merely exploring when driving slowly on a dirt road near midnight in a remote area near the Mexican border. He claimed he drove slowly to avoid potholes and chose not to

use his GPS to get home. QM also claimed he did not expect to find people but gave them a ride because it was dark.

QM's explanation changed after the interviewing agents indicated they did not believe him and were deciding whether to charge him criminally. QM then admitted he desperately needed money, so he responded to the Snapchat message offering payment for "picking up some Mexicans and driving them." While QM admitted his own misconduct, he tried to shield Appellant from blame. QM insisted the gun found in the vehicle did not belong to either of them and Appellant did not know in advance that they would pick up "Mexicans" to transport.

Homeland Security agents also interviewed Appellant. He denied any prior knowledge of a plan to pick up the "Mexicans." He claimed he rented the vehicle just to go sightseeing with QM and his girlfriend. At first, Appellant told the agents his own vehicle was "broken." He later admitted his vehicle was not broken, but claimed it had been at a Firestone repair store for about a week for diagnosis before a planned trip to Florida, but he could not get to it for unspecified reasons. Appellant also denied owning the gun found in the rental vehicle, claiming it belonged to someone named "Taylor."

After discovering that Appellant and QM had factory reset their phones, and therefore had no contact information for the person who had contacted QM via WhatsApp, Homeland Security released Appellant and QM at approximately 0700 on 23 August 2021. Appellant returned to Davis-Monthan AFB, where investigators from the SFOI interviewed him later that day. Appellant reasserted his claim he rented the vehicle for sightseeing while his own vehicle was "broken" and "in the shop." Appellant continued to insist the gun was not his. Appellant did not provide an address or street reference for the Firestone shop and muttered softly "just Firestone" when the interviewing agents specifically asked Appellant for the address of the specific Firestone location. Contrary to his previous version of events, Appellant now claimed he sold his Glock-45 pistol to a person named "Lloyd" in March 2020 and had executed a bill of sale for the transaction.

Follow-on investigation by SFOI refuted many of Appellant's statements. SFOI canvassed the three closest Firestone locations to Davis-Monthan AFB but found no evidence Appellant's vehicle had received services there at the timeframes Appellant claimed. Investigators also obtained a Bureau of Alcohol, Tobacco and Firearms Form 4473 showing Appellant purchased the Glock-45 on 19 January 2021, making his claimed sale to "Lloyd" in March 2020 chronologically impossible. SFOI also searched Appellant's room but did not find a bill of sale to "Lloyd" or anyone else. SFOI did, however, find a Glock-45 gun case with a sticker matching the serial number of the pistol seized from the rental SUV.

The Government introduced various forms as evidence at trial pertaining to the five Mexican nationals. Two had an Alien File (A-File), indicating prior interaction with the immigration system. Ms. TMV's A-File indicated she was removed from the country on 5 September 2021. Mr. ONA's A-File showed he was previously removed in September 2017.

**2. Law**

### a. Legal Sufficiency

We review issues of legal sufficiency de novo. *United States v. Harrington*, 83 M.J. 408, 414 (C.A.A.F. 2023) (citing *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019)). "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *King*, 78 M.J. at 221 (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)). "[I]n resolving questions of legal sufficiency, [an appellate court is] bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). "[T]he [G]overnment is free to meet its burden of proof with circumstantial evidence." *Id.* (citation omitted).

### b. Factual Sufficiency

Historically, the Courts of Criminal Appeals (CCAs) have also conducted a de novo review of the factual sufficiency of the evidence. *See United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). The longstanding test for factual sufficiency, rooted in the prior versions of Articles 66, UCMJ, 10 U.S.C. § 866, required the CCAs to "take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399) (applying the version of Article 66(c), UCMJ, in effect prior to 1 January 2019), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018); *see also United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct.

Crim. App. 2021) (citing *Wheeler* and applying the same factual sufficiency test in the context of Article 66(d), UCMJ, effective 1 January 2019).

However, the National Defense Authorization Act for Fiscal Year 2021 amended Article 66, UCMJ, to modify our factual sufficiency review as follows:

> (B) FACTUAL SUFFICIENCY REVIEW.
>
> > (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.
> >
> > (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
> >
> > > (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
> > >
> > > (II) appropriate deference to findings of fact entered into the record by the military judge.
> >
> > (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

FY21 NDAA, Pub. L. No. 116-283, § 542, 134 Stat. at 3611; 10 U.S.C. § 866(d)(1)(B) (*Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*)). The new factual sufficiency standard applies to courts-martial in which every finding of guilty in the entry of judgment is for an offense occurring on or after 1 January 2021. FY21 NDAA, Pub. L. No. 116-283, § 542(e)(2), 134 Stat. 3611, at 3661–62. This court recently analyzed this new statutory standard for factual sufficiency in *United States v. Csiti*, No. ACM 40386, 2024 CCA LEXIS 160 (A.F. Ct. Crim. App. 29 Apr. 2024) (unpub. op.).[10] As will be

---

[10] We are aware that two of our sister courts issued published opinions addressing the new standard. *See United States v. Coe,* 84 M.J. 537, 542–43 (A. Ct. Crim. App. 2024) (en banc); *United States v. Scott*, 83 M.J. 778, 779–80 (A. Ct. Crim. App. 2023), *rev'd on other grounds*, ___ M.J. ___, No. 24-0063/AR, 2024 CAAF LEXIS 68 (C.A.A.F. 1 Feb. 2024); *United States v. Harvey*, 83 M.J. 685, 690–94 (N.M. Ct. Crim. App. 2023), *rev. granted*, ___ M.J. ___, No. 23-0239/NA, 2024 CAAF LEXIS 13 (C.A.A.F. 10 Jan. 2024). These CCAs each held the new statute made it more difficult than previously for an appellant to secure relief on appeal for factual insufficiency. *See Coe,* 84 M.J. at 542 ("[W]e emphasize that our role in a factual sufficiency review is *not* to substitute

further explained in the law and analysis sections, *infra,* we continue to adhere to the *Csiti* framework in analyzing and applying the new factual sufficiency standard. *See Csiti,* unpub. op. at *17–23.

In analyzing the new factual sufficiency standard under Article 66(d)(1), UCMJ (2024 *MCM*), we begin with the principles of statutory interpretation. "In the absence of a statutory definition, the plain language of a statute will control unless it is ambiguous or leads to an absurd result." *United States v. Cabuhat*, 83 M.J. 755, 765 (A.F. Ct. Crim. App. 2023) (en banc) (citing *United States v. Lewis*, 65 M.J. 85, 88 (C.A.A.F. 2007)). Inquiry into the plainness or ambiguity of a statute's meaning "must cease if the statutory language is un-ambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson*, 519 U.S. at 340 (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240 (1989)); *see also Cabuhat*, 83 M.J. at 766 (quoting *Robinson*). By contrast, when the text is ambiguous, reviewing courts may apply the statutory canons of construction to resolve those ambiguities. *See Cabuhat*, 83 M.J. at 765–66 (citing *Robinson*, 519 U.S. at 341). In construing amended legislation, three canons of construction are particularly applicable. First, we "assume that Congress is aware of existing law when it passes legislation." *United States v. McDonald*, 78 M.J. 376, 380 (quoting *Miles v. Apex Marine Corps*, 498 U.S. 19, 32 (1990)). Second, "[w]hen Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *United States v. Matthews*, 68 M.J. 29, 37 (C.A.A.F. 2009) (quoting *Stone v. Immigration and Naturalization Service*, 514 U.S. 386, 397 (1995)). Third, the "surplusage canon" provides, "if possible, every word and every provision is to be given effect and that no word should be ignored or needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." *United States v. Sager*, 76 M.J. 158, 161 (C.A.A.F. 2017).

### c. Transporting Aliens

At Appellant's court-martial, the Government had to prove beyond a reasonable doubt that Appellant violated the Federal Assimilated Crimes Act, an offense not capital, by transporting illegal aliens in violation of Article 134, UCMJ. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), ¶ 91.c.(4)(a)(1)(iii). As instructed by the military judge, the Government was required to prove beyond a reasonable doubt the elements of 8 U.S.C. § 1324 by establishing: (1) on or about 22 August 2021, within the State of Arizona, Appellant knowingly transported or moved five named individuals to help

---

ourselves for the factfinder and decide what verdict we would have rendered."); *Scott*, 83 M.J. at 780; *Harvey*, 83 M.J. at 693.

them remain in the United States illegally; (2) the individuals transported or moved were aliens; (3) the individuals transported or moved were not lawfully in the United States; (4) Appellant knew or acted in reckless disregard of the fact the individuals transported or moved were not lawfully in the United States; and (5) the charged federal statute, 8 U.S.C. § 1324, is an offense not capital. 8 U.S.C. § 1324(a)(1)(A)(ii).[11],[12]

Proof that an alien is not lawfully in the United States may include circumstantial evidence, including any suspicious manner of travel upon their entry into the United States. *See United States v. Munoz*, 412 F.3d 1043, 1049 (9th Cir. 2005) (citation omitted) (holding that the aliens' actions in paying to be smuggled across the border and hiding in a secret compartment in a vehicle attempting to cross the border supported inferences that the aliens were unlawfully in the United States); *see also United States v. Rivera*, NMCCA 200201611, 2005 CCA LEXIS 42, at \*7 (N.M. Ct. Crim. App. 9 Feb. 2005) (unpub. op.) (finding "overwhelming evidence" where three aliens (1) were traveling across an international border concealed in a closed trunk, (2) did not have entry documentation when interviewed and searched, (3) did not respond to questions or directions in English, and (4) were subsequently deported).

### d. Conspiracy to Transport Aliens

As charged, to obtain a conviction for conspiracy to transport aliens, the Government had to prove beyond a reasonable doubt: (1) Appellant entered into an agreement with one or more persons to commit an offense under the UCMJ, to wit: clause 3 of Article 134, incorporating 8 U.S.C. § 1324; and (2) while the agreement continued to exist, and while Appellant remained a party to the agreement, Appellant or at least one of the co-conspirators performed an overt act for the purpose of bringing about the object of the conspiracy, to wit: securing a rental vehicle, driving the vehicle to the United States-Mexico

---

[11] The military judge, without objection from the parties, essentially adopted the pattern jury instructions used by the United States Court of Appeals for the Ninth Circuit when advising the court members as to the substantive elements of the transporting-aliens offense. *See* MANUAL OF MODEL CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT, ¶ 9.2 (2010 ed.) (Last updated Dec. 2019).

[12] Insofar as this is a Title 8, United States Code, federal offense, we consult persuasive caselaw from the federal circuit courts to interpret what is sufficient evidence to meet these elements. The parties cite to caselaw from several federal circuits. We are not bound by such interpretations. *See United States v. Blanchard*, 48 M.J. 306, 310 (C.A.A.F. 1998) (holding the military judge did not err "by failing to strictly follow selected federal decisions in making his authenticity determination" (citation omitted)). However, insofar as the offense occurred within the Ninth Circuit, we look to the Ninth Circuit caselaw as the most persuasive in construing the evidentiary requirements of 8 U.S.C. § 1324.

border, and transporting five Mexican nationals in violation of law. *See* 10 U.S.C. § 881(a); *MCM*, pt. IV, ¶ 5.b.(1).

Proof of an "agreement" creating a conspiracy "need not be in any particular form or manifested in any formal words. It is sufficient if the minds of the parties arrive at a common understanding to accomplish the object[s] of the conspiracy, and this may be shown by the conduct of the parties." *MCM*, pt. IV, ¶ 5.c.(2). Further, "[a]n overt act by one conspirator becomes the act of all without any new agreement specifically directed to that act and each conspirator is equally guilty even though each does not participate in, or have knowledge of, all of the details of the execution of the conspiracy." *MCM,* pt. IV, ¶ 5.c.(4)(c). It is possible that one may withdraw from a conspiracy without criminal liability, but only if that person "abandons or withdraws from the agreement to commit the offense *before the commission of an overt act by any conspirator*[.]" *MCM,* pt. IV, ¶ 5.c.(6) (emphasis added).

### 3. Analysis

Appellant challenges both the factual and legal sufficiency of his conviction for transporting aliens asserting that: (1) "the trial did not address whether [Appellant] 'acted willfully in furtherance of' the individuals' unlawful status;" (2) "the Government failed to prove [Appellant's] purpose in participating in the pickup and transportation of the aliens;" (3) "the Government failed to establish that the five individuals were aliens in the United States unlawfully;" and (4) the evidence did not prove Appellant knew or acted in reckless disregard of their immigration status.

Appellant also challenges the factual and legal sufficiency of his conspiracy conviction for transporting aliens by asserting: (1) the Government failed to present sufficient proof that the conspiratorial agreement occurred; and (2) the Government failed to prove that any agreement between QM and Appellant encompassed every element of the underlying charged offense (*i.e.*, transporting aliens).[13]

We pause first to clarify the correct analytical lens for Appellant's first listed factual sufficiency challenge. Appellant alleges the military judge's instructions that the transportation must "help [the immigrants] remain [in] the United States illegally" led to the conviction being factually insufficient because the instructions did not specifically use the statutory phrase "in

---

[14] The Government concedes these allegations satisfy Appellant's burden under the new factual sufficiency standard to raise a specific deficiency on appeal. *See* Article 66(d)(1)(B), UCMJ, 10 U.S.C. § 866(d)(1)(B) (2024 *MCM*). Accordingly, we now analyze these specific alleged deficiencies, while reviewing the actual testimony and evidence in the record under the new "appropriate deference" standard.

furtherance of" from 8 U.S.C. § 1324.[14] Notwithstanding Appellant's novel endeavor to frame instructional error as "factual sufficiency," this particular challenge to his transporting aliens conviction requires reframing as a legal sufficiency challenge as it centers on allegations of instructional error which Appellant waived at trial. Appellant agreed to the findings instructions on the elements of these offenses without objection and has acknowledged such on appeal. Therefore, he has waived his right to challenge these instructions. *See United States v. Davis,* 79 M.J. 329, 333 (C.A.A.F. 2020); *see also United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) ("[W]aiver, 'the intentional relinquishment or abandonment of a known right,' differs from forfeiture, 'the failure to make the timely assertion of a right.'" (Baker, J., concurring in the result) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993))). Furthermore, consistent with the analysis below, we conclude the evidence at trial was legally sufficient to demonstrate Appellant's participation in transporting the five aliens in his rental SUV was "in furtherance of" their illegal presence within the United States.

With that, we now address the legal sufficiency of each offense in turn. We will then analyze the new Article 66(d)(1)(B), UCMJ, factual sufficiency standard and apply it to Appellant's transporting aliens and conspiracy convictions. For the reasons set forth below, after having fully reviewed all evidence admitted during trial, we hold that Appellant's convictions were both legally and factually sufficient.

### a. Legal Sufficiency: Transporting Aliens

Drawing all reasonable inferences in favor of the Government for the evidence presented at trial, the Government provided more than sufficient proof for each of the four charged elements, *supra*, for the transporting aliens offense to meet the "very low threshold" for legal sufficiency. *King*, 78 M.J. at 221. The evidence admitted provides five bases for proving Appellant knowingly participated in the transportation of the five Mexican aliens unlawfully in the United States: (1) QM's admissions to USCBP that QM responded to the Snapchat message agreeing to transport Mexicans to make "easy money;" (2) Appellant's extension of the SUV rental agreement used to transport the aliens that same day; (3) the presence of Appellant's handgun in the center console (for what Appellant asserted was a mere sightseeing trip); (4) Appellant's consciousness of guilt manifest in his obstruction of justice in factory resetting his phone; and (5) strong circumstantial evidence the Mexican nationals were in fact

---

[14] Appellant's brief asserts: "[B]ecause the words 'in furtherance of' were absent from the entire trial, the factfinder was never required to make the requisite finding of [Appellant]'s purpose in transporting the immigrants, if any."

unlawfully in the United States given their surreptitious method of travel and mode of dress.

First, QM's videotaped admissions to USCBP agents were presented to the trier of fact below and establish his initial false statements followed by his ultimate admission of guilt, to wit: (a) QM initially told investigators, "[W]e were just sightseeing;" however, (b) QM, in the same interview, admitted he responded to the Snapchat message for money. While QM also claimed that Appellant had neither knowledge of the plan nor of the gun found in the vehicle rented in Appellant's name—a rational trier of fact could be unpersuaded by these assertions (*see also* further analysis concerning similar claims by Appellant, *infra).*

Before turning to address Appellant's statements to law enforcement, we pause to consider one of Appellant's key contentions in this brief: QM also told law enforcement Appellant uttered in surprise "[W]hy the f[**]k is they [the five aliens] ducking?" after the Mexican nationals entered the SUV. However, this statement does not detract from the legal sufficiency of the evidence because, drawing, as we must, all reasonable inferences in favor of the Government, we conclude a rational trier of fact could reasonably either discount or consider in a different light than QM's claim given QM's close relationship with Appellant at the time. This, combined with QM's own confessed lies to investigators just moments before in the same interview, significantly undermines the credibility of QM's uncorroborated assertion that Appellant uttered those words. Moreover, the evidence at trial also supports an inference by a rational trier of fact that any such comment by Appellant actually represents circumstantial evidence of his concern about getting caught (*i.e.,* "ducking" while inside the SUV is an incriminating, furtive gesture).

Second, we address Appellant's explanations in his interviews with USCBP and SFOI as to the timing and reason he rented the SUV used to transport the Mexican nationals. These videotaped interviews were presented to the trier of fact at trial. However, other trial evidence contradicted Appellant's assertions in these interviews. In convicting Appellant, a rational trier of fact below could have concluded Appellant's self-serving denials as to the plan to pick up and transport the Mexican nationals were dubious. As to the timing of Appellant's decision to extend the rental car contract, phone records introduced at trial indicate QM called Appellant at 1130 on the date of the incident, and that Appellant extended the car rental one hour later. This fact can rationally be viewed as more coordinated than coincidental considering Appellant's handgun was also in the rental vehicle. Bringing a handgun for protection would seem unusual and unnecessary were this all just a "joyride" and Appellant was merely in the "wrong place at the wrong time" as trial defense counsel suggested to the court members. As to Appellant's explanations for the purpose of

the car rental, he initially explained that he needed a rental car for a sightseeing trip with QM because his own car was at Firestone—purportedly undergoing a ten-day "diagnostic check;" law enforcement recovered no evidence to corroborate Appellant's claim.

Third, more specifically as to the significance of the presence of the gun found in the center console of the SUV, both QM and Appellant denied that it was Appellant's, and Appellant went so far as to assert he had previously sold it. A rational trier of fact could weigh these denials and claims against the contradictory proof the serial number matched a gun registered to Appellant, matched the gun case found in Appellant's dorm room, and law enforcement did not recover a bill of sale from Appellant's dorm room after a full search of the premises. More telling still, the original bill of sale ATF form for Appellant's purchase of his Glock-45 on 19 January 2021 *post-dated* the time Appellant asserted he "sold" the same gun to the unknown "Lloyd" in 2020. Viewed in this light, a rational trier of fact could have concluded Appellant's claims were demonstrably false, and having done so, considered those false claims as consciousness of guilt as to the underlying transporting aliens offense.

Fourth, Appellant and QM's post-arrest activities also manifest a significant consciousness of guilt, providing circumstantial evidence of prior planning and coordination. QM and Appellant factory reset their phones between the time Sergeant CM initially detained them and USCBP agents questioned them. Expert testimony contradicted Appellant's claim that he inadvertently factory reset his phone by innocently mis-entering his personal identification number (PIN) ten consecutive times. The court members at trial were free to rely upon these underlying facts for dual purposes: to find Appellant obstructed justice in deleting the contents of his phone in anticipation of a law enforcement investigation against him and as consciousness of guilt pertaining to Appellant's involvement in the plan to, and actual illegal transportation of, the Mexican aliens. *See United States v. Quezada*, 82 M.J. 54, 58 (C.A.A.F. 2021) (appellant's false statements during a law enforcement interview were admissible to prove both the charged Article 107, UCMJ, false official statement, and as consciousness of guilt he committed the separately charged Article 120, UCMJ, sexual assault offense).

Fifth, the Government presented significant circumstantial evidence sufficient to demonstrate the five aliens were unlawfully in the United States. *See King*, 78 M.J. at 221 (citations omitted) (holding "the [G]overnment is free to meet its burden of proof with circumstantial evidence"); *Rivera*, 2005 CCA LEXIS 42, at *7 (finding "overwhelming evidence" for reasons explained *supra*). QM and Appellant's rental vehicle picked up five strangers in the Arizona desert less than ten miles from the Mexico border while driving off road and in response to turn-by-turn directions from an unknown caller with a foreign area

code that continuously texted QM during the moments preceding their apprehension by USCBP. Sergeant CM testified these passengers had a distinctive foul, musty smell of people traveling through the desert. None of them spoke English and all of them received instructions in Spanish from a man in the gray shirt who ushered them into Appellant's rental SUV. The aliens wore camouflage and carpet shoes which, according to the USCBP agent's testimony, are commonly donned by people who want to obscure their footprints and avoid tracking and detection. While the court members at trial were only presented with direct evidence that one of the Mexican nationals was subsequently deported (Ms. TMV on 5 September 2021), they also had evidence that another (Mr. ONA) had been previously deported. A rational trier of fact could have relied on this circumstantial evidence to conclude the other three aliens were likewise in the country unlawfully.

Finally, one other point bears mentioning in terms of Appellant's actual knowledge of the "unlawful status" of the Mexican nationals in this case. When USCBP agents asked Appellant if he knew if the people who boarded his rental car were unlawfully in the United States, Appellant admitted: "Well, kind of, yeah, but I didn't look in the back." Additionally, Appellant personally observed all the events listed above with the exception of the deportations. From these circumstances, a rational trier of fact had ample basis to conclude Appellant actual knew or recklessly disregarded the Mexican nationals' unlawful status.

Therefore, viewing the evidence in the light most favorable to the Government, and drawing all reasonable inferences therefrom, a rational trier of fact could have found the elements of illegally transporting aliens as proven beyond a reasonable doubt.

### b. Legal Sufficiency: Conspiracy to Transport Aliens

Appellant asserts his conviction for the conspiracy to transport aliens is legally and factually insufficient on two grounds: (1) the Government failed to present sufficient proof that an agreement occurred; and (2) the Government failed to prove that any agreement between QM and Appellant encompassed every element of the underlying charged offense (*i.e.,* transporting aliens). Appellant's arguments may essentially be distilled down to this: there was no *direct evidence* of an agreement between him and QM. This claim is unavailing, however, because there was ample *circumstantial evidence* from the course of conduct of Appellant and QM to demonstrate an agreement.

The Government provided sufficient proof of each element of Appellant's conspiracy. The evidence admitted against Appellant demonstrating he entered into a conspiratorial agreement with QM to illegally transport Mexican nationals starts with their communications prior to renting the SUV. The

substance of those communications is lost because Appellant factory reset his phone before his interview by USCBP agents; however, available phone records show prior coordination between QM and Appellant—a mere hour and twenty minutes prior to acting in concert to extend the SUV rental used to transport the five Mexican nationals.

Further, Appellant's admissions during his SFOI interview demonstrate their agreement encompassed every element of the offense, including their plan to pick up and transport aliens unlawfully entering the United States. A careful reading of Appellant's professed "surprise" to SFOI investigators that QM picked up the five Mexican aliens shows Appellant's actual prior knowledge of the scheme. In response to SFOI's question of why Appellant did not start to ask questions after he and QM were roaming the Arizona desert within a few miles of the Mexico border, Appellant responded: "[W]e were still passing like border patrol troopers and things like that, so didn't think he was going to do it." That language indicates Appellant was alert to the presence of border patrol *prior* to picking up the Mexican nationals and only *surprised* when QM still decided to do so. Appellant's candor (perhaps unwitting) further supports that Appellant's one-day extension of the SUV and the appearance of Appellant's gun in the vehicle were not a coincidence—they were part of an agreement between Appellant and QM to transport illegal aliens for money.

Therefore, viewing the evidence in the light most favorable to the Government, and drawing all reasonable inferences therefrom, a rational trier of fact could have found the elements of conspiracy proven beyond a reasonable doubt.

### c. Factual Sufficiency: Analyzing the "New" Standard

We follow this court's analysis in *Csiti* in construing the three key components of the new Article 66(d)(1)(B), UCMJ, factual sufficiency review: (1) appellant's "specific showing of a deficiency of proof;" (2) the court affording "appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence" when we "weigh the evidence and determine controverted questions of fact;" and (3) whether the court is "clearly convinced that the finding of guilty was against the weight of the evidence." Unpub. op. at *17–23 (citations omitted). As in *Csiti*, after reviewing all the evidence we are not clearly convinced that the weight of the evidence does not support the conviction beyond a reasonable doubt.[15]

---

[15] We *do not* agree with Appellant that the phrase "clearly convinced" is mere surplusage with no substantive impact on our standard of review. Such an interpretation would be contrary to the accepted canons of statutory construction. *See Sager,* 76 M.J. at 161 ("[I]f possible, every word and every provision is to be given effect and that no

20

### d. Factual Sufficiency: Applying the "new" standard

We now apply the new factual sufficiency review standard to Appellant's assertions that his convictions for both transporting and conspiring to transport aliens within the United States are factually insufficient. Consistent with the evidentiary support for the convictions detailed above, and cognizant that the Government may prove its case by circumstantial evidence, and giving appropriate deference to the fact that the court-martial members saw and heard the testimony and other evidence, we are not clearly convinced the findings of guilty were against the weight of the evidence. Accordingly, we find the convictions factually sufficient.

## C. Motion to Dismiss for Government's Deportation of the Five Aliens

U.S. Immigration and Customs Enforcement removed the five "aliens" referenced above from the country prior to trial. Appellant filed a motion to dismiss the charges because this government action rendered the aliens unavailable to testify on his behalf. The military judge denied Appellant's motion and Appellant now appeals.

Appellant suggests the military judge erred in finding no due process violation and failing to analyze this matter as a "lost evidence issue" under R.C.M. 703(e), a provision concerning physical evidence rather than witness testimony. We find the military judge did not err.

### 1. Additional Background

USCBP conducted video-recorded interviews with Appellant and QM and unrecorded interviews with the five Mexican nationals. The patrol agent-in-

---

word should be ignored or needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."); *Matthews*, 68 M.J. at 37 (quoting *Stone*, 514 U.S. at 397) ("When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect."). For now, suffice it to say that the recent statutory amendments to the new Article 66, UCMJ, added what was never present before—an explicit quantum of persuasion embedded within the explicit text of the statute itself, namely: "clearly convinced." Accordingly, we generally concur with the United States Army Court of Criminal Appeals that "the new burden of persuasion with its required deference makes it more difficult for one to prevail on appeal[.]" *See Scott*, 83 M.J. at 780.

Even were we to adopt Appellant's interpretation of the new Article 66(d)(1)(B), UCMJ, standard, we ourselves are convinced beyond a reasonable doubt that Appellant is guilty of these offenses after having thoroughly reviewed all the evidence and testimony from the record of trial.

charge ultimately declined to prosecute Appellant on 23 August 2021.[16] Based upon factual proffers provided by the parties during motions practice, the military judge entered a finding of fact that, *circa* August 2021, USCBP had authority to decline to prosecute suspected smugglers of aliens, and if so, to remove the aliens from the United States summarily. This policy existed to ameliorate the then-significant public health concerns arising from the possible spread of COVID-19 in detention facilities. Consistent with this policy, USCBP removed the five Mexican nationals from the United States.[17] Neither trial counsel nor trial defense counsel interviewed them before or after their removal.

USCBP did, however, notify the Air Force of Appellant's apprehension. The Air Force then independently investigated this incident. Charges were preferred against Appellant in November 2021, and referred to a general court-martial in December 2021. On 19 and 24 January 2022, trial defense counsel filed separate motions related to the Government's removal of the aliens. One motion sought to compel production of the aliens as trial witnesses and to exclude the aliens' statements during custodial interviews with USCBP as hearsay. The other motion sought to dismiss the relevant charges if the Government failed to produce these witnesses, who the Prosecution could not compel to testify.

The military judge held an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session prior to trial. The military judge then granted the first motion in part, excluding the aliens' statements to USCBP as testimonial hearsay.[18] The military judge denied the second motion to dismiss, however, finding: (1) no due process violation or bad faith for the Government's removal of the witnesses, and (2) no relief warranted under R.C.M. 703 for "lost evidence" because Appellant failed to demonstrate the unavailable witnesses could provide favorable testimony of central importance to an issue essential for a fair trial.

---

[16] The decision not to prosecute was not fully documented in the record, but a USCBP agent who interviewed QM told him: "What we are interested in, [inaudible], we are interested in the people that hired you, the people who contacted you, the people that told you where to go, that kind of thing. That is what we are interested in."

[17] Prosecution Exhibit 5 indicates Ms. TMV was deported on 5 September 2021. During motions practice, the parties stipulated that the other four Mexican nationals had also been deported prior to trial.

[18] The Mexican nationals were not produced as witnesses and their statements to USCBP that they were traveling to the United States without prior authorization were not admitted.

### 2. Law

#### a. Standard of Review

This court reviews a military judge's rulings on production of witnesses and related motions to dismiss for abuse of discretion. *United States v. McElhaney*, 54 M.J. 120, 126 (C.A.A.F. 2000). This is a deferential standard requiring "more than a mere difference of opinion" between the trial and appellate court. *United States v. Warda*, 84 M.J. 83, 90 (C.A.A.F. 2023) (citation omitted). A military judge only abuses his discretion if his "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *Id.* (citations omitted).

#### b. Fifth and Sixth Amendments

A criminal defendant's requests for production of witnesses favorable to his defense implicates both his Fifth Amendment[19] Due Process and Sixth Amendment[20] Compulsory Process rights. The seminal case on point is *United States v. Valenzuela-Bernal*, where the United States Supreme Court held:

> the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution. The mere fact that the Government deports such witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or Due Process Clause of the Fifth Amendment. A violation . . . requires some showing that the evidence lost would be both material and favorable to the defense.

458 U.S. 858, 872–73 (1982).

The prevailing view among the federal circuits is *Valenzuela-Bernal* requires an appellant to meet a two-prong test to merit constitutional relief. *See United States v. Damra*, 621 F.3d 474, 485–490 (6th Cir. 2010); *United States v. Medina-Villa*, 567 F.3d 507, 517–518 (9th Cir. 2009); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 623–624 (7th Cir. 2000); *United States v. Iribe-Perez*, 129 F.3d 1167, 1173 (10th Cir. 1997). First, the appellant must show the

---

[19] U.S. CONST. amend. V.

[20] U.S. CONST. amend. VI.

Government acted in bad faith. Second, the appellant must show the witness would have provided testimony material and favorable to his defense.

Bad faith exists if the Government either: (1) acted with an intent "to gain an unfair tactical advantage" in removing the aliens, or (2) departed from "normal" agency practice in such removal. *United States v. Pena-Gutierrez,* 222 F.3d 1080, 1085 (9th Cir. 2000) (citation omitted).

When a prospective witness has been removed from the United States, the defense's burden for demonstrating materiality of the witness's testimony is "relaxed." *Valenzuela-Bernal,* 458 U.S. at 867. "The term 'favorable' as used in both Supreme Court and military precedent is synonymous with 'vital.'" *United States v. Smith,* 68 M.J. 445, 448 (C.A.A.F. 2010) (citing *United States v. Banker,* 60 M.J. 216, 218 (C.A.A.F. 2004) (quoting *Valenzuela-Bernal,* 458 U.S. at 867)). An appellant, however, does carry a factual burden to establish both materiality and favorability, to wit, he must make "at least make some plausible showing of how [the deported witness's] testimony would have been both material and favorable to his defense." *Id.* In making this showing, "the defendant's unsupported word alone is not sufficient . . . where the defendant maintains only that the potential witness 'could explain' or 'might have testified' in some favorable fashion." *Damra,* 621 F.3d at 490 (citing *Iribe-Perez,* 129 F.3d at 1173).

### c. R.C.M. 703

Generally, "[t]he prosecution and defense and the court-martial shall have equal opportunity to obtain witnesses and evidence, . . . including the benefit of compulsory process." R.C.M. 703(a). There are separate and different rules for resolving pretrial matters concerning unavailable witnesses, R.C.M. 703(b)(3), and unavailable physical evidence, R.C.M. 703(e)(2). No party is entitled to the production of an unavailable witness. R.C.M. 703(b)(3). A military judge shall, however, grant a continuance or abate the proceedings if: (1) "the testimony of a witness who is unavailable is of such central importance to an issue that it is essential to a fair trial," (2) "there is no adequate substitute for such testimony," and (3) the requesting party did not cause the witness's unavailability. *Id.* A military judge may also continue or abate the proceedings under similar circumstances involving unavailable physical evidence. R.C.M. 703(e)(2). An accused cannot demonstrate the necessity of a requested witness when it is only a "theoretical possibility" the witness's testimony would actually benefit the defense case. *United States v. Relves,* 41 M.J. 388, 394 (C.A.A.F. 1995).

### 3. Analysis

#### *a. Fifth and Sixth Amendments*

At the outset, we note Appellant does not challenge the military judge's findings of fact pertinent to the motion, but only his legal reasoning. Likewise, we see no "clearly erroneous" findings of fact by the military judge.

We find the federal precedent persuasive and elect to follow the prevailing view that the Supreme Court's analysis in *Venezuela-Bernal* sets up a two-prong test which Appellant must meet to establish a constitutional violation. Appellant cannot meet the first prong of this test, however, as the facts demonstrate no "bad faith" or departure from regular procedure in the summary removal of the five Mexican nationals at issue in this case. Appellant does not contest the military judge's conclusion as a matter of fact that the summary removal policy was in effect and was standard agency practice at the time of Appellant's case.

Because Appellant cannot meet this first prong of the *Venezuela-Bernal test,* his request for constitutional relief fails. In resolving this constitutional issue, we find it unnecessary to analyze whether these witnesses would have provided material and favorable testimony at trial. We do, however, address the absence of favorability below in our analysis of Appellant's claim under R.C.M. 703.

#### *b. R.C.M. 703*

The applicable reference point for evaluating possible remedies for "unavailable" necessary witnesses is R.C.M. 703(b)(3). We note the military judge's ruling did not mention R.C.M. 703(b)(3), but only a related provision, R.C.M. 703(b)(1). Even so, his analysis embraced some of the components of R.C.M. 703(b)(3), particularly the lack of demonstrated favorability of the Mexican nationals if called as defense witnesses. We find no legal error because the military judge's conclusions were ultimately correct and we are empowered to affirm a military judge's rulings below when he reached the right result, albeit for a different reason. *See United States v. Bess*, 80 M.J. 1, 11–12 (C.A.A.F. 2020) (citations omitted).

Here, the evidence was not "of central importance to an issue essential for a fair trial" because there is no indication any testimony would have been favorable for the Defense. Appellant offers only speculation as to the prospective testimony of the five Mexican nationals.[21] That simply is not enough. *See*

---

[21] Without citation to any supporting facts, Appellant's brief asserts:

*Relves*, 41 M.J. at 394. There was no indication any of the five Mexican nationals could understand anything purportedly uttered between Appellant and QM during their brief ride prior to their detention by USCBP. Nor was there any indication that lighting in the car was sufficient during the brief ride for the passengers to observe, much less draw impressions of Appellant's demeanor, as Appellant now speculates. Instead, the only evidence presented to the military judge was not favorable to Appellant's case: the alien passengers admitted to being Mexican nationals without prior authorization to enter the United States.

In the end, we agree with the military judge's conclusion that "the evidence tends to show that [the requested witness] production . . . would be *detrimental* to the Defense case because it would help the Government prove the illegal alien status of the [Appellant's] passengers . . . ." (Emphasis added). Accordingly, we find the military judge did not abuse his discretion in denying the motion to dismiss. *See McElhaney*, 54 M.J. at 128 (holding no abuse of discretion for denial of defense witness production request because "the agent's testimony would have been counter-productive for the defense").

## D. Omission of Government's Closing Argument Slides from the Record of Trial

### 1. Additional Background

The record of trial includes a complete audio recording and verbatim transcript of trial counsel's closing argument at findings. However, the Government's closing argument PowerPoint slides, marked as Appellate Exhibit XL, were not included.[22] These slides contained portions of video and audio clips separately admitted as Prosecution Exhibit 18 (the video recorded interview of Appellant by SFOI) and Defense Exhibit A (the video recorded interview of QM by USCBP). Defense counsel lodged no objection to the Government's slides. The only portions marked "inaudible" in the closing argument transcript dealt with portions of Defense Exhibit A and Prosecution Exhibit 18 that were

---

> On the facts here, there are a number of things that the immigrants *could* have discussed: who was in charge, who was sending messages, how [Appellant] reacted when they came into the car, whether [Appellant] was assisting or passive, or anything else they were told that would indicate [Appellant] had a role QM's plan. . . . [S]uch testimony *could* have proven critical.

(Emphasis added).

[22] An exhibit marked as "Appellate Exhibit XL" is included in the record of trial, but it consists of a video recording that appears to be a duplicate of Defense Exhibit A, the videotaped interview of QM.

likewise labeled "inaudible" in the verbatim trial transcripts capturing when those exhibits were played during the parties' cases-in-chief.

### 2. Law

Proper completion of post-trial processing is a question of law this court reviews de novo." *United States v. Valentin-Andino*, 83 M.J. 537, 540 (A.F. Ct. Crim. App. 2023) (citation omitted). "Because they are matters of law, we review interpretations of statutes and Rules for Courts-Martial de novo." *Id.* (citation omitted).

An appellant has a right to a full and fair review of his conviction under Article 66, UCMJ. *United States v. Walters*, 58 M.J. 391, 397 (C.A.A.F. 2003). To this end, Article 54, UCMJ, 10 U.S.C. § 854, requires, "[i]n accordance with regulations prescribed by the President, a complete record of proceedings and testimony shall be prepared in any case of a sentence of death, dismissal, discharge, confinement for more than six months, or forfeiture of pay for more than six months."

Article 1, UCMJ, 10 U.S.C. § 801(14), defines the term "record" as: "(A) an official written transcript, written summary, or other writing relating to the proceedings; or (B) an official audiotape, videotape, or similar material from which sound, or sound and visual images, depicting the proceedings may be reproduced." A record of trial should include "[e]xhibits, or, if permitted by the military judge, copies, photographs, or descriptions of any exhibits that were received in evidence and any appellate exhibits." R.C.M. 1112(b)(5).

An incomplete record of trial only entitles an appellant to relief if he was prejudiced. *See United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999) (citation omitted). In this context, prejudice focuses on the reviewing court's ability to perform its statutory duty to conduct a full and thorough review of the case. *United States v. Henry*, 53 M.J. 108, 111 n.* (C.A.A.F. 2000). "A substantial omission renders a record of trial incomplete and raises a presumption of prejudice that the Government must rebut[.]" *Id.* at 111 (citations omitted). By contrast, "[i]nsubstantial omissions . . . do not raise a presumption of prejudice or affect that record's characterization as a complete one." *Id.* So the threshold question is whether the item is substantial, either qualitatively or quantitatively. *United States v. Davenport*, 73 M.J. 373, 377 (C.A.A.F. 2014) (citing *United States v. Lashley*, 14 M.J. 7, 9 (C.M.A. 1982) (additional citation omitted). Omissions from the record are qualitatively substantial if the substance of the omitted material "related directly to the sufficiency of the Government's evidence on the merits." *Id.* (citation omitted). Omissions are quantitatively substantial if "the totality of omissions . . . becomes so unimportant and so uninfluential when viewed in the light of the whole record, that it approaches nothingness." *Id.* (citing *United States v. Nelson*, 3 C.M.A. 482, 487 (C.M.A.

1953)). While a substantial omission raises a presumption of prejudice, it can be rebutted by the Government. *United States v. Harrow*, 62 M.J. 649, 654–55 (A.F. Ct. Crim. App. 2006) (citation omitted).

### 3. Analysis

First, the entirety of trial counsel's closing argument (during which he utilized the PowerPoint slides) was transcribed substantially verbatim. Appellant raises no assignment of error as to the substance of trial counsel's closing argument, meaning the absence of these slides has no discernable impact on our ability to conduct a full and thorough appellate review in Appellant's case. Further, trial defense counsel did not object contemporaneously to any portions of trial counsel's argument, meaning even if he did challenge the substantive argument on appeal, it would be reviewable only for plain error.

Second, the "inaudible" portions of video and audio clips from Prosecution Exhibit 18 and Defense Exhibit A were separately admitted into evidence with the same imperfections, and without objection. Ultimately, we are unpersuaded by Appellant's argument: "[C]ounsel must know what evidence the trial counsel showed the members to assess whether the argument asked the members to draw inferences not flowing from the evidence[.]" In effect, appellate defense counsel already *do know* what was presented— excerpts from the recordings from Prosecution Exhibit 18 and Defense Exhibit A that are already included in the record of trial.

Third, the lack of an objection tends to render the slides' omission as "insubstantial" because it has no measurable impact on our ability to perform a full and fair appellate review for Appellant's case, particularly in light of the presence of the underlying video recordings already admitted and reviewable as separate exhibits within the record of trial. *See Henry*, 53 M.J. at 111.

Appellant has not established that he is entitled to any relief. Under the circumstances, we conclude that trial counsel's closing argument PowerPoint slides were an insubstantial omission from the record of trial. Even assuming, arguendo, the missing PowerPoint slides constitute a "substantial omission" from the record of trial, the Government has rebutted any presumption of prejudice.

**E. Unlawful Immigrant Criminal History as Sentencing Aggravation Evidence**

Appellant argues the military judge abused his discretion in admitting the criminal history of one of the Mexican nationals, Mr. ONA,[23] as aggravation evidence under R.C.M. 1001(b)(4) during the presentencing proceedings. For the reasons set forth below, assuming without deciding that this was improper aggravation evidence, we find no prejudice because the Government has demonstrated this evidence did not substantially influence the adjudged sentence.

**1. Additional Background**

The military judge admitted Mr. ONA's criminal history at the presentencing proceedings over trial defense counsel's objection. This history was admitted as Prosecution Exhibit 28, consisting of a two-page Form I-213, *Record of Deportable Alien*, showing Mr. ONA had three prior convictions in the United States between 2003 and 2017 for drunk driving offenses each resulting in a term of confinement of 30 days or more. The military judge, in support of his ruling, articulated his Mil. R. Evid. 403 balancing analysis orally on the record:

> The court does find this to be evidence in aggravation of the crime as it directly relates to or results from the crime specifically. It is evidence that appears to show that one of the individuals the [Appellant] was transporting had a criminal history[;] that is directly related to or resulting from his . . . crime of transporting that illegal alien. The court has conducted an Mil. R. Evid. 403 balancing test and finds that probative value is not substantially outweighed by any danger of unfair prejudice in this case. The court will put this document and the testimony in the proper context, recognizing that severity or lack thereof of criminal behavior and how long ago it occurred [o]n this date on this particular form. However, this court will give this evidence and testimony the weight it deserves. It is admissible as aggravation evidence.

At the close of sentencing arguments, the military judge, *sua sponte*, provided additional affirmation of his knowledge of the limited use of aggravation evidence in informing an appropriate sentence by explaining, "This court

---

[23] The court notes that the charge sheet reflects this Mexican national's name as Mr. ONA, but Prosecution Exhibit 28, described *infra*, and Prosecution Exhibits 7–9, show this Mexican national's name as Mr. ONA. It appears the charge sheet has a scrivener's error. For purposes of this opinion, the court will refer to him as Mr. ONA. Appellate raises no issue regarding this error.

understands its duty to sentence the accused only for the crimes of which he has been convicted to the extent . . . trial counsel's argument discussed his prior history of misconduct or any uncharged offenses."

### 2. Law

A military judge's decision to admit evidence at sentencing is reviewed for abuse of discretion. *United States v. Carter*, 74 M.J. 204, 206 (C.A.A.F. 2015) (citation omitted). Military judges abuse their discretion when their "factual findings are clearly erroneous, view of the law is erroneous, or decision is outside of the range of reasonable choices." *United States v. Hutchins*, 78 M.J. 437, 444 (C.A.A.F. 2019) (citations omitted).

The Government may present evidence during sentencing of "any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty." R.C.M. 1001(b)(4). Evidence qualifying under R.C.M. 1001(b)(4) must also pass muster under Mil. R. Evid. 403. *United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007). A military judge may exclude evidence if its probative value is substantially outweighed by such considerations as its tendency to result in unfair prejudice, confuse the issues, or mislead the trier of fact. Mil. R. Evid. 403. A military judge has "wide discretion" in applying Mil. R. Evid. 403 and we exercise "great restraint" in reviewing such applications when the military judge has articulated his reasoning on the record. *United States v. Humpherys*, 57 M.J. 83, 91 (C.A.A.F. 2002) (citations omitted).

For preserved objections, if an alleged error occurs in the admission of sentencing matters, the test for prejudice is "whether the error substantially influenced the adjudged sentence." *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009) (citation omitted). To make this determination, reviewing appellate courts weigh four factors: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *United States v. Edwards*, 82 M.J. 239, 247 (C.A.A.F. 2022) (citations omitted).

### 3. Analysis

In this judge-alone sentencing case, we elect to resolve this assignment of error based upon the absence of prejudice. We consider each of the four factors articulated in *Edwards* in turn.

First, the Government's sentencing case was moderately strong. The Government's sentencing case relied on the severity of the most significant convicted misconduct, *i.e.*, transporting aliens and conspiring to do so, and Appellant's prior history of misconduct (including nonjudicial punishment for prior marijuana use, followed by a vacation action for additional misconduct), which evidenced Appellant's diminished rehabilitative potential to date.

Second, and by contrast, the strength of the defense sentencing case was modest. It consisted of heartfelt testimony from Appellant's mother and father about their love for and pride in their son, along with five character statements from family and friends attesting to Appellant's love and care for his family and friends. All of this, while commendable, does not significantly mitigate the weight of misconduct Appellant committed.

Third, considering the materiality and quality of the evidence in question, we conclude the evidence had limited "materiality" in terms of potential impact on the adjudged sentence. The military judge's qualifying caveat about putting "this document and testimony in the proper context" based on remoteness in time and relative lack of severity would accord this evidence scant weight in the final sentencing determination.[24] Moreover, the parties paid this evidence little attention in their sentencing arguments,[25] further reducing the likelihood the military judge placed undue focus or reliance on the evidence in deliberating on an appropriate sentence.

Moreover, the sentence for the transportation and conspiracy charges to which the disputed aggravation evidence was relevant demonstrates the absence of any "substantial influence" on the adjudged sentence. Here, the military judge imposed 24 months of confinement running concurrently, although trial counsel had requested 36 months and the parties agreed 25 years was the maximum punishment for each offense. In sum, the Government has demonstrated any error in admitting Mr. ONA's criminal history did not "substantially influence" the adjudged sentence.

## F. Maximum Punishment for Transporting Aliens and Conspiracy to Transport Aliens

### 1. Additional Background

At trial, the military judge, trial counsel, and trial defense counsel relied on the plain language of 8 U.S.C. § 1324(a)(1)(B)(ii) in agreeing Appellant's aggregate maximum punishment for each specification was 25 years—5 for

---

[24] We agree with Appellant's characterization that Prosecution Exhibit 28 provided only "skeletal details" of Mr. ONA's criminal history. There is no mention of the underlying facts for each incident or whether injuries to persons or property occurred. This absence of additional detail reduced the likelihood of prejudice by significantly minimizing the materiality of this evidence. Appellant's brief concedes as much in saying: "[S]tanding alone, [this evidence] would not be enough to move the needle on prejudice."

[25] Trial counsel dedicated only 7 of the 95 transcribed lines of his sentencing argument to discussion of the aggravation evidence. Trial defense counsel only obliquely commented on it in 3 of the 99 transcribed lines of his/her sentencing argument.

each alien listed therein.[26] For the first time on appeal, Appellant claims the maximum punishment for each specification should be five years.

### 2. Law

8 U.S.C. § 1324(a)(1)(B)(ii) provides that an offender is subject to as much as five years in prison "for each alien in respect to whom such a violation occurs."

#### a. Standard of Review

"The maximum punishment authorized for an offense is a question of law, which [this court reviews] de novo." *United States v. Beaty*, 70 M.J. 39, 41 (C.A.A.F. 2011) (citations omitted). We review a military judge's sentencing determination for abuse of discretion. *Id.* (citation omitted). "[W]here a military judge's decision was influenced by an erroneous view of the law, that decision constitutes an abuse of discretion." *Id.* (citation omitted).

#### b. Waiver

Failure to lodge an objection may result in waiver or forfeiture of the issue. *See United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017). This "is a question of law [courts] review de novo." *Id.* (citation omitted). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *Davis*, 79 M.J. at 331 (quoting *Gladue*, 67 M.J. at 313; *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009) (citations omitted)).

Appellate courts generally review forfeited issues for plain error, but "a valid waiver leaves no error to correct on appeal." *Ahern*, 76 M.J. at 197 (citation omitted). In other words, if the appellant waived the objection, the appellant is precluded from raising the issue before either the CCA or the United States Court of Appeals for the Armed Forces (CAAF). *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (citing *Gladue*, 77 M.J. at 313–14). However, under the prior version of Article 66(d), UCMJ,[27] CCAs had an affirmative obligation to examine the entire record to determine whether "to leave an [appellant's] waiver intact or to correct the error," with our superior court premising that waiver-piercing authority in the previous statute on the statutory phrase "should be approved." *See id.*

---

[26] The issue was explicitly discussed during presentencing proceedings and trial defense counsel's precise words in response to trial counsel's articulation of the maximum punishment calculations for these offenses was: "We concur, Your Honor."

[27] As discussed *supra* at Part II.B.2.b, the amended version of Article 66(d), UCMJ, applicable to Appellant's case applies in cases where all convicted misconduct occurred on or after 1 January 2021.

### 3. Analysis

The parties agree the military judge's maximum punishment calculation should be evaluated for plain error. We disagree, however, because trial defense counsel's affirmative concurrence with the calculation at trial waived this issue. This was not an oversight, but "an intentional relinquishment of a known right." *See Davis*, 79 M.J. at 331; *Campos,* 67 M.J. at 332 (citations omitted).

Even assuming arguendo that our waiver-piercing authority as to waived errors impacting sentencing survived after the FY21 NDAA amendments to Article 66(d), UCMJ (*cf. United States v. Coley*, ARMY 20220231, 2024 CCA LEXIS 127, *9 (A. Ct. Crim. App. 13 Mar. 2024) (unpub. op.) (holding 2021 amendments to Article 66(d), UCMJ, abrogated the CCA's ability to pierce waiver as to errors associated with findings) (citations omitted)),[28] we would decline to pierce the waiver in this case where we tend to think the maximum punishment was ultimately calculated correctly at trial. *See United States v. Blanks*, No. ACM 38891, 2017 CCA LEXIS 186, at *22 n.11 (A.F. Ct. Crim. App. 17 Mar. 2017) (unpub. op.) (holding "we will only ignore waiver in the most deserving cases").

At the very least, piercing waiver would be unnecessary because Appellant suffered no prejudice requiring a remand for resentencing even if the maximum punishment was incorrectly calculated for these offenses. Here the military judge ultimately sentenced Appellant to 24 months' confinement for each offense, running concurrently—less than one half of the possible confinement even if Appellant's view of the maximum punishment under 8 U.S.C. § 1324 is correct. Accordingly, even if we were inclined to pierce the waiver in this case,

---

[28] In *Chin*, the CAAF predicated the CCA's waiver-piercing authority on the phrase "should be approved" in the prior version of Article 66(c), UCMJ. 75 M.J. at 223. The CAAF explained that during its Article 66, UCMJ, review, "the CCA is commanded by *statute* to review the entire record and approve only that which 'should be approved.'" *Id.*

As noted *supra* at Part II.B.2.b, while the 2021 amendments to Article 66, UCMJ, removed this language as to *findings* (*see* 116 Pub. L. 283, § 542(b)(1)), they left it intact as to *sentencing* (at least until the effective date of the new Article 66(e), UCMJ, which applies to convicted crimes committed on or after 27 December 2023. *See* 117 Pub. L. 81, § 539E(f) (also FY22 NDAA). Accordingly, for purposes of this case, this court appears to still have waiver-piercing authority as to waived errors impacting the *sentence*. This is so because, under the FY21 NDAA amended version of Article 66(d)(1), UCMJ, that applies to Appellant's case, we "may affirm only the sentence, or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, *should be approved*." *See* 116 Pub. L. 283, §542(b)(1) (emphasis added).

we could have confidently reassessed the sentence and concluded the military judge would have sentenced Appellant to the same term of confinement even under Appellant's suggested maximum punishment calculation. After all, the military judge was sentencing Appellant for the *same set of operative facts*—it was only the available maximum punishments which had changed. *Cf. United States v. Winckelmann*, 73 M.J. 11, 16 (C.A.A.F. 2013) (noting consideration of "[w]hether the nature of the remaining offenses capture the gravamen of criminal conduct included within the original offenses, and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant" as a positive factor favoring sentence reassessment by a court of criminal appeals).

## G. Maximum Punishment for Absence Without Leave (AWOL) and Breaking Restriction Convictions

Appellant alleges the military judge imposed more than the maximum permissible confinement for his absence without leave (AWOL) conviction—Charge I and its specification—and his breaking restriction conviction—Charge II and its specification. For the reasons set forth below, we agree and grant relief in our decretal paragraph.

### 1. Additional Background

During the providency inquiry for Appellant's guilty pleas to each of the specifications of Charges I, Charge II, and Charge III (wrongful use of marijuana), the military judge correctly articulated the maximum punishments for each of these offenses, including one month confinement for each of the specifications of Charges I and II, and two years for the specification of Charge III. The military judge imposed separate terms of confinement for each of these convicted specifications. While he correctly announced the maximum one-month confinement terms for each of the specifications of Charges I and II during the providency inquiry, the military judge ultimately erroneously sentenced Appellant to two months' confinement for the specification of Charge I and three months' confinement for the specification of Charge II. Meanwhile, the military judge announced a sentence of three months' confinement for the specification of Charge III and designated those three terms of confinement run concurrently, and consecutive to terms of confinement for the remaining convicted offenses. Trial defense counsel did not object to the announced sentence either at trial or any time during post-trial processing, culminating with the entry of judgment.[29] Now on appeal, Appellant requests we affirm no more

---

[29] Appellant does not claim on appeal that the errors at trial in failing to object to the terms of confinement for Charges I and II involved ineffective assistance of counsel.

than one month's confinement, respectively, for each of the specifications of Charges I and II. The Government argues that the erroneously high sentences did not "materially prejudice" Appellant because these sentences ran concurrently with the specification of Charge III, and thus had no impact on the total effective length of confinement adjudged.

**2. Law**

We review the lawfulness of a sentence de novo. *See United States McElhaney*, 83 M.J. 164, 166 (C.A.A.F. 2023).

Congress authorized maximum punishments "as a court-martial may direct" for both Articles 86 and 87b, UCMJ. Exercising power under Article 56, UCMJ, 10 U.S.C. § 856, to set maximum punishments for offenses, the President set a term of one month as the maximum confinement for AWOL lasting less than three days (Article 86, UCMJ) and for breaking restriction (Article 87b, UCMJ). *MCM*, pt. IV, ¶¶ 10.d.(2)(A); 13.d.(3).

When acting as the sentencing authority, a military judge must specify a term of confinement for each offense. Article 56(c)(2), UCMJ, 10 U.S.C. § 856(c)(2). "The punishment which a court-martial may direct for an offense may not exceed such limits as the President may prescribe for that offense." Article 56(a), UCMJ, 10 U.S.C. § 856(a).

In reviewing the legality of sentences imposed at courts-martial, we may affirm only "the sentence or such part or amount of the sentence as [we] find[ ] correct in law and fact," and we may act only "with respect to the findings and sentence as entered into the record." Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1); *see also United States v. Bennett*, No. ACM S32722, 2023 CCA LEXIS 293, at *14 (A.F. Ct. Crim. App. 14 Jul. 2023) ("[W]e cannot approve a sentence that is not correct in law.").

**3. Analysis**

The military judge committed clear and obvious error in announcing his sentence as to each of the specifications of Charges I and II. The record demonstrates the military judge was aware of the correct maximum punishments, but announced segmented sentences above those maximums for each of the specifications of Charges I and II.

While the military judge's error was clear, there was no impact to the total effective length of Appellant's sentence to confinement because the military judge designated the confinement for each of the specifications of Charges I–III to run concurrently. Because the military judge also imposed three months'

---

Our sentence modification sufficiently addresses the error and we need not *sua sponte* address these other possible issues.

confinement for the specification of Charge III (wrongful use of marijuana), the erroneous sentences for each of the specifications of Charges I and II were subsumed with the concurrent sentencing for the specification of Charge III.

Nonetheless, we must correct the error because we are obligated to approve only those "findings and sentence that are correct in law and fact." *See United States v. Flores*, __ M.J. __, No. 23-0198/AF, 2024 CAAF LEXIS 162, at *1 (C.A.A.F. 14 Mar. 2024) (holding that CCAs are required to review each segment of confinement adjudged in a judge-alone sentencing case for appropriateness). Accordingly, we take action in our decretal paragraph to reduce the confinement periods for each of the specifications of Charges I and II, in alignment with the actual permissible maximum punishments available. We analogize this to essentially a "sentence reassessment" where we are confident that but for the error the military judge would have imposed a particular quantum of punishment. *See Winckelmann*, 73 M.J. at 12. Here, we are confident the military judge would have adjudged the entirety of the maximum confinement available for each of the specifications of Charges I and II. Accordingly, we "reassess" the terms of confinement for each of the specifications of Charges I and II to one month each, which we reflect in our decretal paragraph.

## H. Sentence Appropriateness

Appellant challenges the appropriateness of the sentences for his transporting aliens and conspiracy convictions. He alleges the 24-month concurrent sentence he received for these offenses is excessive when compared to the federal sentencing guidelines applicable in civilian courts. He also offers sentences imposed in certain military and non-military cases involving similar conduct for comparison. Hewing to our independent obligation under Article 66(d), UCMJ, to conduct sentence appropriateness review *in toto*, we consider not only the appropriateness of Appellant's sentences for the specific offenses he challenges, but also his entire sentence. For the reasons set forth below, we find Appellant's sentence is not inappropriately severe.

### 1. Law

#### a. Sentence Appropriateness Generally

We review issues of sentence appropriateness de novo. *See McAlhaney*, 83 M.J. at 166 (citation omitted). Our authority "reflects the unique history and attributes of the military justice system [and] includes . . . considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact. Article 66(d), UCMJ. In review of judge-alone sentencing, we "must consider the appropriateness of each segment of a segmented sentence and the appropriateness of the sentence as a whole." *See Flores*, 2024 CAAF LEXIS 162, at *1.

"We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citation omitted). Although appellate courts are empowered to "do justice[ ] with reference to some legal standard," we are not authorized to grant mercy. *United States v. Guinn*, 81 M.J. 195, 203 (C.A.A.F. 2021) (quoting *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010)).

### b. Sentence Comparison

CCAs are "not required . . . to engage in sentence comparison with specific [other] cases 'except in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.'" *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (quoting *United States v. Ballard*, 20 M.J. 282, 288 (C.M.A. 1985)) (additional citation omitted). Cases are "closely related" when, for example, they involve "co-actors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared." *Id.* "[A]n appellant bears the burden of demonstrating that any cited cases are 'closely related' . . . ." *Id.*

The test for whether sentences are "highly disparate" is "not limited to a narrow comparison of the relative numerical values of the sentences at issue, but also may include consideration of the disparity in relation to the potential maximum punishment." *Id.* at 289. "If the appellant meets that burden, or if the court raises the issue on its own motion, then the Government must show that there is a rational basis for the disparity." *Id.* at 288.

A CCA is not required to compare an appellant's case to non-closely related cases. *United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001). "The appropriateness of a sentence generally should be determined without reference or comparison to sentences in other cases." *United States v. LeBlanc*, 74 M.J. 650, 659 (A.F. Ct. Crim. App. 2015) (en banc) (citing *Ballard*, 20 M.J. at 283).

In *United States v. Lacy*, the CAAF described a CCA's "sentence review function" as "highly discretionary." 50 M.J. at 288. CAAF observed the interplay between individualized sentencing and uniformity:

> Congress has furthered the goal of uniformity in sentencing in a system that values individualized punishment by relying on the judges of the Courts of Criminal Appeals to "utilize the experience distilled from years of practice in military law to determine whether, in light of the facts surrounding [the] accused's delict, his sentence was appropriate. In short, it was hoped to attain

> *relative* uniformity rather than an arithmetically averaged sentence."

*Id.* (alteration in original) (quoting *United States v. Olinger*, 12 M.J. 458, 461 (C.M.A. 1982)).

"Sentence comparison does not require sentence equation." *United States v. Durant*, 55 M.J. 258, 260 (C.A.A.F. 2001). "[T]he military system must be prepared to accept some disparity in the sentencing of codefendants, provided each military accused is sentenced as an individual." *Id.* at 261–62 (citations omitted). "[C]harging decisions by commanders in consultation with their trial counsel, as well as referral decisions by convening authorities after advice from their [s]taff [j]udge [a]dvocates, can certainly lead to differences in sentencing." *Id.* at 261.

### 2. Analysis

We are not persuaded any of the cases Appellant cites in his briefs are "closely related." Appellant was not a co-actor with any of the defendants cited in those cases; there was no "direct nexus" between Appellant's crimes and theirs; and the mere fact the same type of misconduct was committed (*i.e.*, illegal transportation of aliens) does not render the cases closely related. Furthermore, our caselaw contemplates case comparisons to other servicemembers, *not* civilians. *See Ballard*, 20 M.J. at 284–85. Article 66, UCMJ, sentence appropriateness review is focused upon uniform and evenhandedness of sentencing within the unique disciplinary environment of the military, not civilian society at large. *See, e.g., id.* at 285 n.4 ("Even if appellant could demonstrate the drug sentences are more severe in the military, as a whole, than in civilian jurisdictions, we are satisfied that such differences can be readily justified by an urgent necessity in the military that is simply not present in the civilian community." (citations omitted).).

Even if we were to depart from precedent and consider civilian cases as "closely related," we are unpersuaded the federal sentencing guidelines applicable in civilian courts are helpful measures of evenhandedness of sentences in courts-martial. *See United States v. Kroetz*, No. ACM 40301, 2023 CCA LEXIS 450, at *21 (A.F. Ct. Crim. App. 27 Oct. 2023) (unpub. op.) ("We presume that the military judge would not improperly apply federal sentencing guidelines when determining [an a]ppellant's sentence in a military court-martial."); *see also United States v. Garner*, 39 M.J. 721, 727 (N.M.C.M.R. 1993) (holding "the Federal Sentencing Guidelines do not apply to trial by courts-martial").

Similarly, we are unpersuaded Appellant's sentence of 24 months' confinement for transporting and conspiring to transport five Mexican nationals is "highly disparate" when compared to the military cases he offers. First, all of

those involved defendants who pleaded guilty, a substantial factor in mitigation that Appellant's case lacks.[30] Secondly, Appellant's case contains additional aggravating factors, including the presence of a firearm and obstruction of justice.

In the end, having considered all the evidence in the record, and the interest in uniformity and evenhandedness of sentencing decisions generally, we are convinced Appellant's specific confinement sentences for the transporting and conspiring to transport aliens offenses, and his overall sentence (as corrected in our decretal paragraph) were appropriate.

## I. Post-Trial Delay: From Sentencing to Docketing and Docketing to Decision

Appellant requests relief for delay in docketing his case with this court following the entry of judgment for his court-martial because 200 days elapsed from sentencing to docketing, vice the 150 days allotted under our precedent in *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020). We ourselves identified an additional issue of post-trial delay from the docketing of the case with this court to the issuance of our decision because more than 18 months have elapsed triggering review for "facially unreasonable delay" under our superior court's precedent in *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)). After evaluating the facts and circumstances and applying the applicable legal standards surrounding these two periods of delay, we conclude no relief is warranted.

### 1. Additional Background

Appellant was sentenced on 18 February 2022 and submitted his clemency matters on 7 March 2022. The convening authority issued his decision on action memorandum on 21 March 2022. The military judge signed the entry of judgment on 20 April 2022.

The court reporter began preparation of the verbatim transcript on 14 March 2022. Transcription and assembly of the record continued until final certification on 28 July 2022. During this time, the court reporter transcribed

---

[30] To be clear, to say that Appellant lacks this mitigating factor is different from asserting that this court deems greater punishment appropriate for an accused who merely exercises his right to plead not guilty—we do not. *See United States v. Johnson*, 1 M.J. 213, 215 (C.M.A. 1975) (holding a not-guilty plea, standing alone, does not conversely carry with it a negative implication capable of aggravating a sentence). Rather, we are acknowledging the fact that, unlike the comparison cases, Appellant is unable to rely upon a guilty plea as a mitigating factor potentially representing the "first step towards rehabilitation" which our caselaw recognizes. *See United States v. Nelson*, 51 M.J. 399, 400 (C.A.A.F. 1999) (citation omitted); *Johnson*, 1 M.J. at 215.

portions of the audio recordings for trial days 1, 2, 4, and 5, and transmitted them to counsel on a rolling basis between 2 May 2022 and 21 June 2022 for review and submission of any edits. The court reporter also transcribed an unrelated board of inquiry and three other general courts-martial between 22 March 2022 and 16 June 2022.

In the meantime, the servicing legal office contracted with a private company for additional trial transcription for the remaining portions of the trial audio for trial day 3. This company completed its transcription on 10 July 2022. Trial counsel provided their final transcript edits on 20 July 2022, and trial defense counsel provided their final edits on 28 July 2022. The court reporter certified the entire trial transcript on 28 July 2022. The record of trial (ROT) consists of 11 volumes, including 639 pages of transcripts, 28 prosecution exhibits, 10 defense exhibits, and 48 appellate exhibits. The servicing legal office mailed copies of the certified ROT to Appellant, trial defense counsel, and the general court-martial convening authority's legal office on 15 August 2022. This court received and docketed this case on 6 September 2022, 200 days after Appellant's court-martial was adjourned.

Thereafter, appellate defense counsel requested and was granted (over the express objection of the Government) 11 enlargements of time (EOT) to file Appellant's assignments of error brief. Appellant's first appellate counsel withdrew (with Appellant's knowledge and consent) during the course of this appeal on 28 September 2023. Thereafter Appellant's new appellate counsel filed Appellant's assignments of error on 31 October 2023, 421 days after the case was docketed with this court. It was at this time that Appellant first invoked this right to speedy post-trial processing, some 13 months after docketing of his case with this court. The Government filed its answer brief on 18 December 2023, after this court granted it one 30-day EOT. The Defense filed Appellant's reply brief on 5 January 2024.

**2. Law**

"[C]onvicted servicemembers have a due process right to timely review and appeal of [their] courts-martial convictions." *Moreno*, 63 M.J. at 135 (citations omitted). We review de novo whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether any constitutional error is harmless beyond a reasonable doubt. *United States v. Arriaga*, 70 M.J. 51, 57 (C.A.A.F. 2011) (citing *Moreno*, 63 M.J. at 135).

*Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of a convicted person's grounds for appeal and ability to present a defense at a rehearing. *Moreno*, 63 M.J. at 138–39 (citations omitted). In *Livak,* this court established an aggregated sentence-to-docketing 150-day threshold for

facially unreasonable delay in cases, like Appellant's, that were referred to trial on or after 1 January 2019. *Livak,* 80 M.J. at 633. A presumption of unreasonable delay also arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed. *Moreno*, 63 M.J. at 142.

If there is a presumptive or an otherwise facially unreasonable delay, we examine the matter under the four non-exclusive factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *Barker*, 407 U.S. at 530). "We analyze each factor and make a determination as to whether that factor favors the Government or [Appellant]." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533).

"No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Even in the absence of a due process violation resulting from excessive post-trial delay, "a Court of Criminal Appeals has authority under Article 66[, UCMJ,] to grant relief for excessive post-trial delay without a showing of 'actual prejudice' within the meaning of Article 59(a)[, UCMJ], if it deems relief appropriate under the circumstances." *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002) (citation omitted). The essential inquiry under *Tardif* is whether, given the post-trial delay, the sentence "remains appropriate[ ] in light of all circumstances." *Toohey*, 63 M.J. at 362 (citing *United States v. Bodkins,* 60 M.J. 322, 324 (C.A.A.F. 2004) (per curiam)).

We provided a further analytical framework for that analysis in *United States v. Gay*, where we set forth six factors to consider before granting "sentence appropriateness" relief under *Tardif* and *Toohey*, even in the absence of a due process violation:

> 1. How long did the delay exceed the standards set forth in [*Moreno*]?
>
> 2. What reasons, if any, has the [G]overnment set forth for the delay? Is there any evidence of bad faith or gross indifference to the overall post-trial processing of this case?

3. Keeping in mind that our goal under *Tardif* is not to analyze for prejudice, is there nonetheless some evidence of harm (either to the appellant or institutionally) caused by the delay?

4. Has the delay lessened the disciplinary effect of any particular aspect of the sentence, and is relief consistent with the dual goals of justice and good order and discipline?

5. Is there any evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation?

6. Given the passage of time, can this court provide meaningful relief in this particular situation?

74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd,* 75 M.J. 264 (C.A.A.F. 2016). In our consideration of the above factors, "no single factor [is] dispositive, and a given case may reveal other appropriate considerations for this court in deciding whether post-trial delay has rendered an appellant's sentence inappropriate." *Id.* (footnote omitted).

### 3. Analysis

In this case, two periods of delay were facially unreasonable under *Livak* and *Moreno*: the delay between sentencing and docketing with this court and between docketing and the issuance of this court's opinion. Accordingly, we consider each period of delay in light of the *Barker* factors.

### *a. Post-trial Delay from Sentencing to Docketing*

#### *i) Length of delay*

The 200 days that elapsed between sentencing and docketing exceeded *Livak*'s 150-day threshold for facially unreasonable post-trial delay by one-third. We find this factor favors Appellant.

#### *ii) Reasons for delay*

The court reporter was actively working four other cases while transcribing Appellant's case. The servicing legal office also took affirmative steps to expedite the completion of the trial transcript, securing additional trial transcription services from an outside company. The 150 days it ultimately took to transcribe the record was perhaps slower than might be anticipated for a 639-page transcript, but there is no evidence of any "deliberate attempt to delay the [appeal] in order to hamper the defense." *See Barker,* 407 U.S. at 531. As such, we find this delay does not represent intentionally dilatory action by the Government. Given that crowded dockets and busy legal offices are simply a fact of life in the modern military justice practice, we find this factor only slightly favors Appellant.

### iii) Request for speedy post-trial processing

Appellant did not invoke his right to speedy post-trial processing during the 200 days between sentencing and the docketing of his case with this court. We find this weighs against Appellant.[31]

### iv) Prejudice

We will conduct a consolidated prejudice analysis for both periods of post-trial delay. *See* subsection II.I.3.b.iv, *infra.*

## b. Post-trial Delay from Docketing to Decision

### i) Length of delay

Just under 22 months elapsed from the docketing of Appellant's case with this court until the issuance of our decision. This exceeded the *Moreno* requirement by approximately four months. This factor slightly favors Appellant; the vast majority of the delay here was specifically requested by Appellant. *See United States v. Washington*, No. ACM 39761, 2021 CCA LEXIS 379, *109 (A.F. Ct. Crim. App. 30 Jul. 2021) (unpub. op.) (holding that 23 months from case docketing to issuance of the court's opinion was "not excessively long" in a five assignment of error case resulting in three separate opinions from the panel).

### ii) Reasons for delay

While the length of the delay may be facially unreasonable, the primary reason was this court's latitude in granting Appellant's requested EOTs. While this court does not begrudge appellate defense counsel for requesting EOTs when necessary to ensure zealous representation of Appellant and fulsome briefing of the issues, the fact that 421 days of delay are attributable to the Defense—compared to only 48 days for the Government to file its brief and then about 195 days for this court to prepare and issue its opinion—demonstrates reasonableness on the part of the Government and this court in the processing of Appellant's case once it arrived here. *See Moreno*, 63 M.J. at 138 (holding a period of six months for a CCA to issue its decision after the appellant's case was joined was "not an unreasonable time for review by the [CCA]").

### iii) Request for speedy post-trial processing

Appellant never requested speedy appellate review of his case prior to the filing of his assignment of errors some 421 days after docketing with this court. Given the apparent absence of urgency in Appellant's eleventh hour speedy

---

[31] *See Moreno*, 65 M.J. at 138 (reasoning that only if Appellant actually "asserted his speedy trial right, [is he] 'entitled to strong evidentiary weight'" in his favor (quoting *Barker*, 407 U.S. at 528)).

post-trial processing rights invocation, this factor weighs neither for nor against Appellant. *See* subsection II.I.3.a.iii, *supra.*

### iv) Prejudice

We do not find Appellant suffered prejudice to any of the three interests the CAAF identified in *Moreno.* In this case, Appellant has not received any relief that would have reduced the amount of time he spent in confinement, so there is no oppressive incarceration. *See Moreno,* 63 M.J. at 139. Similarly, where Appellant's substantive appeal does not result in a rehearing, his ability to present a defense at a rehearing is not impaired. *See id.* at 140. Moreover, we cannot perceive, and Appellant does not articulate, how the substantive grounds for his appeal have been impaired.

### c. Conclusion to Post-trial Delay Claims

Having weighed the applicable factors, we find that neither the 200-day delay between sentencing and docketing with this court nor the approximately 22 months between docketing and this court's decision were a violation of Appellant's due process rights. In the absence of prejudice cognizable under *Moreno*, we find the delay was not so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362.

Furthermore, recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *Gay*, 74 M.J. at 742, we conclude no such relief is warranted.

## III. CONCLUSION

The findings are correct in law and fact, and no error materially prejudicial to the substantial rights of the Appellant occurred. We reassess the segmented sentence for the Specification of Charge I from two months to one month, and the segmented sentence for the Specification of Charge II from two months to one month, and affirm the sentence as entered which calls for a dishonorable discharge, confinement for 27 months, forfeiture of all pay and allowances, and reduction in rank to the grade of E-1. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

Accordingly, the findings and sentence, as reassessed, are **AFFIRMED.**



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court